**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 13, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHARLES BEEN, individually, d/b/a
Creekside Farm, Inc.; DONALD
FROST; EDWIN JOHNSTON; BOB
FIELDS, individually, d/b/a Okie Blue
Sky Farm, Inc.; GENE BLACKWELL,

    Plaintiffs-Appellees,

v.

O.K. INDUSTRIES, INC., an
Arkansas corporation and as
administrator of health and benefit
plans; O.K. FOODS, INC., an
Arkansas corporation and as
administrator of health and benefit
plans; O.K. FARMS, INC., an
Arkansas corporation and as
administrator of health and benefit
plans; O.K. BROILER FARMS
LIMITED PARTNERSHIP, an
Arkansas limited partnership and as
administrator health and benefit plans,

    Defendants-Appellants.

No. 08-7078
(D.C. No. 6:CV-02-00285-RAW)
(E. D. Okla)

---

**ORDER AND JUDGMENT**[*]

---

    [*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 (eff. Dec.
1, 2006) and 10th Cir. R. 32.1 (eff. Jan. 1, 2007).

Before **BRISCOE,** Chief Judge**, BALDOCK,** and **GORSUCH**, Circuit Judges.

Plaintiffs-Appellees ("Growers") filed this action alleging that Defendants-Appellants O.K. Industries, Inc., O.K. Farms, Inc., O.K. Foods, Inc., and O.K. Broiler Farms Limited Partnership (collectively "OK") violated § 202(a) of the Packers and Stockyards Act (PSA), 7 U.S.C. § 192(a). After a jury trial, the Growers prevailed on their claim and were awarded $21,141,975, which the district court reduced to $14,511,935. OK appeals, arguing: (1) the Growers failed to prove that OK engaged in an unfair practice "with respect to live poultry" under the PSA; (2) the Growers failed to prove that OK's allegedly unfair practices injured consumers and that OK had sufficient market power in the output market; (3) there was insufficient evidence to support two of the five possible theories of liability; (4) the district court erroneously admitted expert testimony; and (5) the district court failed to instruct the jury on the statute of limitations. As discussed below, we have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

## I

OK is a vertically integrated poultry producer operating in Arkansas and Oklahoma, and it is the largest poultry integrator in Oklahoma. OK is involved in almost every stage of the production and wholesale of poultry. However, OK

2

does not handle the raising of broiler chickens to slaughtering age, but instead enters into contracts with various "growers" who raise the chickens.

Under OK's standard, non-negotiable contracts, these growers agree to use only chicks and supplies provided by OK. The individual growers also agree not to sell their chickens to other poultry integrators. In turn, OK agrees to provide a grower with only one flock of chicks, which typically takes seven weeks to raise. Then, OK may provide the grower with replacement flocks. Additionally, OK requires each grower to obtain financing and build chicken houses to OK's specifications, which can cost nearly $160,000. OK periodically requires growers to update their chicken houses to meet recent updated specifications.

Plaintiffs-Appellees are a class of growers operating in Oklahoma under contract with OK. They brought this suit alleging, in part, that the terms of OK's non-negotiable contracts and OK's performance under those contracts violate the PSA as unfair practices.

OK filed a motion for summary judgment, and the district court ruled that the PSA required proof of injury to competition, and the Growers failed to establish a genuine issue of material fact regarding competitive injury. The district court granted summary judgment for OK on the PSA claims, as well as on state law claims of unconscionability. The Growers appealed the grant of summary judgment.

On appeal, we held that "a plaintiff who challenges a practice under [PSA]

3

§ 202(a) [must] show that the practice injures or is likely to injure competition."

Been v. O.K. Indus., Inc., 495 F.3d 1217, 1230 (10th Cir. 2007). Applying that

holding to the evidence presented by the parties on summary judgment, we first

concluded that "[t]he record contain[ed] evidence that support[ed] the Growers'

contention that OK [wa]s a monopsony in the relevant regional market." Id. at

1231.[1] We in turn held that, "to establish that the practices of a monopsonist have

injured or are likely to injure competition, a plaintiff does not have to be a

competitor of the buyer or demonstrate that the buyer has improperly excluded

other competitors. Instead, the plaintiff must show that the monopsonist's

practices have caused or are likely to cause the anticompetitive effect associated

with monopsonies, namely the arbitrary manipulation of market prices by

unilaterally depressing seller prices on the input market with the effect (or likely

effect) of increasing prices on the output market." Id. at 1232. We ultimately

concluded "that a genuine issue of material fact exist[ed] as to whether OK

engaged in unfair practices in violation of § 202(a)." Id. at 1233. "In particular,

we note[d] that the record contain[ed] evidence," most notably "expert

testimony," "of the classic monopsony injury, namely that OK [wa]s depressing

---

[1] A monopsony is a "condition of the market in which there is but one buyer for a particular commodity." Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co., 305 F.3d 1124, 1133 n.4 (10th Cir. 2002) (internal quotation marks omitted). "As such, a monopsony is to the buy side of the market what a monopoly is to the sell side . . . .'" Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 320 (2007).

4

the prices it pa[id] the Growers and reselling at inflated prices." Id. We thus reversed the district court's grant of summary judgment for OK on the PSA claim but affirmed the grant of summary judgment regarding the unconscionability of the contracts under state law.

The case proceeded to a jury trial, where the Growers alleged five specific unfair practices that purportedly caused competitive injury in violation of the PSA. The Growers offered testimony that: (1) OK exercised extensive control over the Growers in almost every aspect of production and pay; (2) OK increased the number of days between chicken flocks that it placed with the Growers; (3) OK reduced the number of chickens per square foot of housing space, or "bird density," placed with the Growers; (4) OK exercised control over the specifications for the chicken houses; and (5) OK shared detailed information with other integrators in the form of "Agri Stats," but did not share this information with the Growers, leading to a severe asymmetry of information.

At trial, the Growers offered the expert testimony of Dr. C. Robert Taylor, a professor of agricultural economics, who concluded that each of the above practices reduced production, depressed Grower pay compared to competitive-market levels, and likely increased output prices. Taylor also testified that OK's production practices impacted immediate resale and national prices, conclusions he reached after performing four regression analyses.

Taylor further testified regarding his methodology for calculating the

5

Growers' damages. Taylor calculated the difference between the profits that the Growers actually received and the profits they would have earned in a competitive market, i.e., one free of the alleged violations of the PSA. He concluded that OK underpaid the Growers by up to $14,511,935 as a result of their violations during the class period. OK repeatedly objected to Taylor's testimony, requesting an opportunity to voir dire the witness. The district court denied each request, stating that OK would have its opportunity on cross-examination. Following cross-examination, there was no request to exclude Taylor's testimony, in whole or in part.

The jury returned a verdict, finding that OK violated § 202(a) of the PSA, and awarded the Growers $21,141,975. The district court entered judgment reflecting the verdict and damages on March 25, 2008. On April 8, 2008, OK filed motions for judgment as a matter of law and for a new trial. On July 3, 2008, the district court denied OK's motion for judgment as a matter of law, and it denied OK's motion for a new trial on the condition that the Growers consent to remittitur, reducing the damages to $14,511,935. The district court stated that it would enter an amended judgment upon Grower's acceptance of the remittitur. The Growers consented to the remittitur on July 14, 2008, by filing a document titled "Plaintiffs' Consent to Remittitur," but the district court never entered an amended judgment after that consent was filed. On August 7, 2008, the Growers and OK stipulated to dismissing with prejudice all remaining individual claims.

6

OK filed a notice of appeal on August 12, 2008.

## II

## A. Appellate Jurisdiction

Before considering the merits of this appeal, we must determine whether we have appellate jurisdiction. We raised this issue sua sponte and have received supplemental briefing from the parties.

Generally, we have jurisdiction only over "final decisions" from the district courts. 28 U.S.C. § 1291. In a civil case, a notice of appeal must be filed within thirty days after the entry of judgment. Fed. R. App. P. 4(a)(1)(A). However, when a party files a motion for a new trial, "the time to file an appeal runs for all parties from the entry of the order disposing of" that motion. Fed. R. App. P. 4(a)(4)(A)(v).

Here, OK filed a motion for a new trial after the district court entered a judgment reflecting the jury's verdict and award of damages. The district court then conditionally denied OK's motion, after raising sua sponte the issue of remittitur. Specifically, the district court's July 3, 2008 order stated:

> It is the Order of the Court that the motion of the defendants for new trial . . . is hereby DENIED. . . . The court suggests remittitur of the damages award to $14,511,935. Plaintiffs are given ten days from the date of this order to file a consent to remittitur, at which time an amended judgment will be entered. If plaintiffs do not consent to the remittitur, a new trial as to damages will be ordered.

7

Appellees' App. at 93. The Growers filed a document labeled "Plaintiffs' Consent to Remittitur" with the district court, stating: "Pursuant to the Court's Order of July 3, 2008, Plaintiffs hereby consent to remittitur of the damages award in this case from $21,141,975 to $14,511,935." Appellees' App. at 94. However, the district court never entered an amended judgment after the Growers filed their consent to remittitur.

The critical issue in the present case is whether OK could have filed an appeal once the Growers consented to the remittitur, or if OK was required to wait for the district court to enter an amended judgment. Other circuits have considered this issue, with conflicting results.

The majority of our sister circuits that have considered this issue have concluded that acceptance of remittitur renders the district court's decision final. The Eleventh Circuit was faced with an identical situation in Wright v. Preferred Research, Inc., 891 F.2d 886 (11th Cir. 1990) (per curiam). In Wright, the district court denied the defendant's motion for new trial on the condition that the plaintiff consent to remittitur. See id. at 888. The Eleventh Circuit stated: "When [plaintiff] accepted the remittitur . . . the judgment became final and appealable, actuating the 30-day period within which a notice of appeal must be filed." Id.; see also Mauriello v. Univ. of Medicine and Dentistry of N.J., 781 F.2d 46, 49 (3d Cir. 1986) ("The question is whether the judgment became final when the remittitur order was entered or when the plaintiff's acceptance was

8

filed. We conclude that the latter date is determinative for computing the time for appeal."); Howell v. Marmpegaso Compania Naviera, S.A., 566 F.2d 992, 993 (5th Cir. 1978) (per curiam) (concluding that the plaintiff's "acceptance of the remittitur rendered the judgment final and appealable, and actuated the 30-day time limit within which notice of appeal must be filed").

On the other hand, the Sixth Circuit appears to require entry of a separate, amended judgment before a party may appeal from remittitur. See Anderson v. Roberson, 249 F.3d 539, 542–43 (6th Cir. 2001). In Anderson, the jury returned its verdict for the plaintiffs, and the defendants filed motions for judgment as a matter of law, new trial, and remittitur. Id. at 541. The district court ruled that defendants would be granted a new trial if plaintiffs rejected the remittitur. Id. Although it was unclear whether the plaintiffs ever actually accepted or rejected the remittitur, the Sixth Circuit reasoned:

> Both plaintiffs and defendants have missed the point. Once the district court entered its order giving the plaintiffs the choice between accepting the remittitur or having a new trial, there was no final order from which the parties could appeal. The parties appear to believe that the plaintiffs' action — either accepting or rejecting the remittitur — ends the district court's jurisdiction and opens the door for the case to proceed on appeal. The parties are mistaken. Except for those well-defined occasions when we have jurisdiction over an interlocutory appeal, we do not have jurisdiction over an appeal until the district court issues a final, appealable order. . . . Until the district court either enters a final order based upon the plaintiffs' election to accept the remittitur, or proceeds to judgment after a new trial, there is nothing for this court to review.

Id. at 542–43 (citations omitted).

9

The Growers also direct our attention to language from the Second Circuit's opinion in Ortiz-Del Valle v. Nat'l Basketball Ass'n, 190 F.3d 598, 600 (2d Cir. 1999) (per curiam). In Ortiz-Del Valle, the district court denied the defendant's motion for a new trial conditioned upon plaintiff's acceptance of a new trial or remittitur. Id. at 599. The plaintiff rejected the remittitur and opted for a new trial. Id. The defendants appealed, arguing that the order conditionally denying the motion for a new trial was final and appealable on the date of entry of that order. Id. The Second Circuit disagreed, and noted in dicta that "[w]here the plaintiff elects the remittitur, the defendant's time for filing the notice of appeal runs from the date of entry of the amended judgment reduced as a result of the remittitur. See Fed. R. Civ. P. 58 (judgment not effective until set forth in separate document and entered on civil docket) . . . ." Id. at 600. The Growers contend that this language supports the conclusion that we lack jurisdiction until the district court enters a separate, amended judgment. We disagree.

The above-quoted language from Ortiz-Del Valle does not speak to the finality of the district court's decision. Rather, the quoted portion of the Second Circuit's ruling addresses only the running of the time to file a notice of appeal, explicitly relying on Federal Rule of Civil Procedure 58. Under the version of Rule 58 and the Federal Rules of Appellate Procedure in effect in 1999, some courts had held that the time to file a notice of appeal began to run only once a separate judgment was entered; if a district court never entered a separate

10

judgment, the time to appeal never began to run. See Fed. R. Civ. P. 58 advisory committee's note (2002 amendments); see also Casey v. Long Island R.R. Co., 406 F.3d 142, 148 (2d Cir. 2005). However, in 2002, the Federal Rules of Civil and Appellate Procedure were amended to address this problem and ensure that the time to appeal was not indefinite. See Fed. R. Civ. P. 58 advisory committee's note (2002 amendments). Therefore, the Second Circuit's opinion that "the defendant's time for filing the notice of appeal runs from the date of entry of the amended judgment," Ortiz-Del Valle, 190 F.3d at 600, is not helpful in resolving the jurisdictional issue in the present appeal.

If anything, the reasoning in Ortiz-Del Valle supports the conclusion that an order becomes final on the date that a party consents to remittitur. Notably, the Second Circuit stated that "[t]he motion [for a new trial] . . . was disposed of on the date when plaintiff rejected the remittitur and instead opted for a new trial." Ortiz-Del Valle, 190 F.3d at 600. By the same logic, OK's motion for a new trial would have been disposed of on the date when Growers consented to the remittitur.

We find the reasoning of the Third, Fifth, and Eleventh Circuits to be more persuasive. When a district court enters an order denying a motion for a new trial on the condition that a plaintiff accept a remittitur for specified damages, the decision is deemed final once the plaintiff accepts the remittitur. "For a ruling to be final, 'it must end the litigation on the merits, and the [district court] must

11

clearly declare [its] intention in this respect.'" Harbert v. Healthcare Serv.

Group, Inc., 391 F.3d 1140, 1145 (10th Cir. 2004) (quoting FirsTier Mortgage Co.

v. Investors Mortgage Ins. Co., 498 U.S. 269, 273–74 (1991)). A final decision

leaves nothing for the district court but to execute the judgment. Id. "[T]he

touchstone of a final order is a decision by the court that a party shall recover

only a sum certain." Id. (internal quotation marks omitted). In the case at bar,

liability had already been determined, and damages were set by the district court

and the Growers' consent. See Green Tree Fin. Corp.-Alabama v. Randolph, 531

U.S. 79, 86 (2000) ("[T]he term 'final decision' . . . is a decision that ends the

litigation on the merits and leaves nothing more for the court to do but execute

the judgment." (internal quotation marks omitted)). Accordingly, Growers'

acceptance of the remittitur rendered the district court's order final. See Howell,

566 F.2d at 993.

Although the district court stated that it would enter an amended judgment

after the Growers consented to the remittitur, that fact does not affect our

appellate jurisdiction. The district court's decision was final regardless of the

court's failure to file a separate judgment. We find persuasive a recent decision

of the Seventh Circuit, Davis v. Advocate Health Center Patient Care Express,

523 F.3d 681 (7th Cir. 2008). In Davis, the district court gave the plaintiff

twenty-five days to pay a filing fee and "noted that if [he] failed to comply with

that deadline, his suit would be dismissed." Id. at 683. The plaintiff never paid

12

the fee, but instead, he waited for the deadline to pass and then filed a notice of appeal. Id. The Seventh Circuit acknowledged that "the district court stated a plan to enter a final judgment in [twenty-five] days unless [the plaintiff] paid his fee, and when [he] refused to pay the fee the court neglected to follow through with its plan," and enter a separate order dismissing the case. Id. Nonetheless, the Seventh Circuit concluded that the "suit ha[d] ended at the district court level," and thus, the decision was final and appealable. See id.

Similarly, although the district court in the case at bar did not follow through with its plan to enter an amended judgment reflecting the reduced damages, the decision was nonetheless final upon the Growers' consent to the remittitur. The district court indicated its intent that its decision was final, explicitly ordering that the Growers had ten days to consent to the remittitur, "at which time an amended judgment will be entered." Appellees' App. at 93 (emphasis added); see Davis, 523 F.3d at 683 ("[T]he district court ordered that, unless [plaintiff] paid his fee, the case would be dismissed (though the court never actually issued a separate order carrying out that threat)."). All that remained at the district court level was for the "ministerial" act of entering an amended judgment. See Star Ins. Co. v. Risk Mktg. Group Inc., 561 F.3d 656, 658 (7th Cir. 2009) ("[O]rders that specifically contemplate further activity in the district court are generally not final. However, if an order contemplates only ministerial actions by the court, finality may exist." (citations and internal

13

quotation marks omitted)); see also Thompson v. Gibson, 289 F.3d 1218, 1221 (10th Cir. 2002) ("[P]reparing and entering a judgment is a ministerial task that can be easily and routinely performed by the Clerk of the Court or his deputies.").

Additionally, even though an amended judgment was never set out in a separate document, we still have jurisdiction over the final decision of the district court. Generally, "[e]very judgment and amended judgment must be set out in a separate document . . . ." Fed. R. Civ. P. 58(a). However, "a separate document is not required for an order disposing of a motion . . . for a new trial, or to alter or amend the judgment, under Rule 59 . . . ." Fed. R. Civ. P. 58(a)(4); but see Fed. R. Civ. P. 58 advisory committee's note (2002 amendments) ("[I]f disposition of the [Rule 59] motion results in an amended judgment, the amended judgment must be set forth on a separate document."); Employers Ins. of Wausau v. Titan Int'l, Inc., 400 F.3d 486, 489 (7th Cir. 2005) (concluding that an order granting a motion for an amended judgment requires a separate document).

We need not decide whether the district court's order—which denied OK's motion for a new trial, but amended the award of damages—required entry of a separate document. Even if the district court should have entered an amended judgment in a separate document, "[a] failure to set forth a judgment or order on a separate document . . . does not affect the validity of an appeal from that judgment or order." Fed. R. App. P. 4(a)(7)(B).

Moreover, we note that the separate-document requirement does not affect

14

the timeliness of this appeal. Generally, if a separate document is not required, then a judgment or order is considered entered when it is entered in the docket. Fed. R. App. P. 4(a)(7)(A)(I); see also Fed. R. Civ. P. 58(c)(1).[2] If, on the other hand, a separate document is required, then the judgment or order is considered entered when it is entered in the docket "and when the earlier of these events occurs: [1] the judgment or order is set forth on a separate document, or [2] 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79(a)." Fed. R. App. P. 4(a)(7)(A)(ii); see also Fed. R. Civ. P. 58(c)(2).[3] OK filed its notice of appeal within thirty days of the Growers' consent to remittitur. Thus, under either scenario, the appeal was timely. See Fed. R. App. P. 4(a)(4)(A).

Additionally, we note when OK filed its notice of appeal, there were no individual claims pending before the district court. When the Growers consented to the remittitur on July 14, individual plaintiffs still had unresolved claims against OK. "As a general matter, a judgment in a consolidated action that does

_____

[2] Although, as discussed above, the district court's order conditionally denying the motion for a new trial was not final when it was entered. Rather, it became final once the Growers satisfied the district court's condition of consenting to the remittitur. See Davis, 523 F.3d at 683 ("[M]ore than 150 days have passed since [plaintiff's] deadline to pay the fee, and the separate document requirement is now moot.").

[3] In such a case, although the notice of appeal would have been premature when filed, it would have been effective when the judgment was deemed entered, Fed. R. App. P. 4(a)(2), 150 days after consent to remittitur. Cf. Davis, 523 F.3d at 683.

not dispose of all claims is not considered a final appealable decision under §

1291." Jackson v. Volvo Trucks N. Am., Inc., 462 F.3d 1234, 1238 (10th Cir.

2006). On the other hand, "where [a] dismissal finally disposes of [a] case so that

it is not subject to further proceedings in federal court, the dismissal is final and

appealable." Id. (internal quotation marks omitted). And here, the individual

plaintiffs and OK stipulated to dismissing with prejudice the remaining claims on

August 7, 2008. See Green Tree, 531 U.S. at 86 ("The District Court's order . . .

dismissed respondent's claims with prejudice, leaving the court nothing to do but

execute the judgment. That order plainly disposed of the entire case on the merits

and left no part of it pending before the court."); Rabbi Jacob Joseph Sch. v.

Province of Mendoza, 425 F.3d 207, 210 (2d Cir. 2005) ("Immediate appeal is

available to a party willing to suffer voluntarily the district court's dismissal of

the whole action with prejudice . . . ."). Thus, when OK filed its notice of appeal,

there were no other claims pending before the district court.[4]

Because OK filed a timely notice of appeal from a final decision of the

district court, we have jurisdiction over this appeal. Accordingly, we turn to the

---

[4] Growers accepted the remittitur on July 14, 2008, and OK then timely filed its notice of appeal on August 12, 2008. We offer no opinion on whether the time to file a notice of appeal may be tolled until the remaining claims were dismissed with prejudice because OK's notice of appeal was timely from the date of the Growers' acceptance of the remittitur.

16

merits of OK's arguments.[5]

## B. Merits

OK argues on appeal that several trial errors require that the judgment be reversed and dismissed, or in the alternative, a new trial should be granted. Specifically, OK contends (1) the Growers failed to prove that OK used an unfair practice "with respect to live poultry" under the PSA; (2) the Growers failed to prove that OK had sufficient market power in the output market; (3) there was insufficient evidence to support two of the five possible theories of liability; (4) the district court erroneously admitted expert testimony; and (5) the district court failed to instruct the jury on the statute of limitations. As outlined below, we reject each of these contentions.

### 1. The meaning of an unfair practice "with respect to live poultry"

OK argues that the PSA requires the Growers to prove that OK used an unfair practice with respect to actual, live birds that have already hatched. In particular, OK argues that under the statute, the Growers were required to show that OK produced certain actual, live chicks, and then either destroyed them or otherwise refused to allow the Growers to raise them. We review issues of

---

[5] The Growers request that we should direct the district court to enter an amended judgment, and inform the district court that it has jurisdiction to act on a motion dated July 18th regarding collateral matters such as costs and fees. Whether the district court retains jurisdiction over any remaining collateral matters has not been presented as an issue on appeal. Our role is not to advise the district court regarding motions that may currently be pending.

17

statutory interpretation de novo, beginning with the plain language of the text and interpreting "the words of the statute in light of the purposes Congress sought to serve." Been, 495 F.3d at 1227 (internal quotation marks omitted).

Section 202 of the PSA provides: "It shall be unlawful . . . for any live poultry dealer with respect to live poultry, to: (a) Engage in or use any unfair . . . practice or device . . . ." 7 U.S.C. § 192. In interpreting this statute, we are mindful that the PSA is a remedial statute, and thus, it is to be "construed liberally in accord with its purpose to prevent economic harm to producers and consumers at the expense of middlemen." Swift & Co. v. United States, 393 F.2d 247, 253 (7th Cir. 1968). "[T]he primary purpose of the PSA [was] to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry and to safeguard farmers against receiving less than the true market value of their livestock." Been, 495 F.3d at 1228 (alterations omitted) (internal quotation marks omitted).

OK contends that the PSA applies only to unfair practices involving chickens that have actually hatched. This argument is without merit. As we have previously recognized, price manipulation in the form of arbitrarily reducing production may violate the PSA as an unfair practice. See Been, 495 F.3d at 1233–34. And a practice that reduces chick production by incubating fewer eggs, for example, is a practice "with respect to live poultry" as much as a practice that reduces chick production by destroying chicks that have already hatched. Both

18

practices result in fewer live chickens being delivered to the Growers to raise and sell back to OK. Thus, either way, OK is reducing the price it pays its Growers for live poultry. In light of plain statutory language and the remedial purpose of the PSA, we reject OK's strained interpretation of the phrase "with respect to live poultry."

Additionally, OK asserts that it cannot be held liable because it delivered all the chicks that it could produce. Conceivably, this is an argument that OK was entitled to a new trial based on insufficient evidence to prove that OK actually reduced production in violation of the PSA. "Where a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." Anaeme v. Diagnostek, Inc., 164 F.3d 1275, 1284 (10th Cir. 1999) (internal quotation marks omitted). We review the evidence "in the light most favorable to the prevailing party . . . ." Id. Upon review of the record, there was sufficient evidence to support the verdict.

OK contends that it could not have reduced the chick population because it always operated its hatcheries at full capacity. But at trial, the Growers' expert, Dr. Taylor, testified that his regression analysis indicated "that when [OK's] returns are low, then they increase days out between flocks which depresses total grower pay." Appellants' App. at 304. Taylor acknowledged that he did not have any knowledge of OK's hatchery capacity, but testified that OK's production

19

levels could vary and the evidence of days between flocks "implies that somewhere they're getting the chicks to put out there." Appellants' App. at 358. Additionally, OK's president testified that production levels vary depending on demand. Viewing this evidence in the light most favorably to the Growers, we conclude that there was sufficient evidence that OK's production levels varied, and that OK did not always operate at full capacity.

## 2. OK's alleged lack of market power

Next, OK argues that because it only has a 2% share of the national poultry market, it necessarily lacked the power to raise consumer prices by suppressing production. OK first raised this argument in its motion for summary judgment, following remand, and renewed it in its post-trial motion for judgment as a matter of law. We review de novo the district court's denial of a motion for judgment as a matter of law. Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs, 613 F.3d 1229, 1235 (10th Cir. 2010).

We conclude, after reviewing the trial record, that the district court did not err in denying OK's motion for judgment as a matter of law. The Growers' expert, Taylor, opined that OK's production practices impacted immediate resale and national prices. That testimony, notwithstanding OK's own evidence of its purported lack of market power, was sufficient in our view both to create a genuine issue of material fact as to whether OK's production practices "over time [were] likely to increase consumer prices for [OK's] products in comparison to

20

what prices would have been but for the practice,"[6] Aplee. Supp. App. at 412

(jury instructions), and to support the jury's verdict in favor of the Growers. See

generally FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61 (1986) ("Since

the purpose of the inquiries into market definition and market power is to

determine whether an arrangement has the potential for genuine adverse effects

on competition, proof of actual detrimental effects . . . can obviate the need for an

inquiry into market power, which is but a surrogate for detrimental effects.")

(internal quotation marks omitted).

### 3. Sufficiency of the evidence to support all the theories of liability

OK argues that the general verdict returned by the jury must be overturned

and the case remanded for new trial because the Growers failed to present

sufficient evidence to establish that two of the five challenged practices, i.e.,

OK's possession of asymmetrical information and OK's requirements regarding

housing specifications, resulted in consumer injury.

The Growers correctly note that OK has not preserved this issue for appeal.

"To preserve a sufficiency of the evidence claim for appellate review, a party

must move for summary judgment as a matter of law (directed verdict) under

Federal Rule of Civil Procedure 50(a) at the close of the evidence." United Int'l

---

[6] We reach no conclusion as to whether the district court correctly instructed the jury that, as to one of the two alternate methods of proof relied on by the Growers at trial, the Growers were required to prove that OK's practices over time were likely to increase consumer prices for OK's products.

Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1228 (10th Cir. 2000).

"Failure to sufficiently raise an issue in a [Rule 50(a)] motion . . . bars appellate review of that issue."  Miller v. Eby Realty Group LLC, 396 F.3d 1105, 1114 (10th Cir. 2005).  We do not require technical precision, but liberally construe the Rule 50(a) motion, asking whether the moving party adequately notified the district court of the issues raised.  See id.

In the first Rule 50(a) motion, at the end of the Growers' case, OK's arguments focused on the statute of limitations, the statutory meaning of "with respect to live poultry," and the theory of liability based on density reductions.[7] Then, OK renewed its motion at the close of all the evidence.  At that time, OK added that there was insufficient evidence regarding the commodity market and consumer injury, and regarding any decrease in production (arguments similar to those asserted in its summary judgment motion).  Nowhere in the Rule 50(a)

---

[7] At the outset of its arguments, OK's counsel stated: "we would renew our motion for summary judgment on the [PSA] . . . ."  Appellant's App. at 423.  In its motion for summary judgment, OK argued,  under a heading entitled "THERE IS NO EVIDENCE THAT O.K.'S CONDUCT WAS LIKELY TO INJURE COMPETITION IN A RELEVANT MARKET," Appellant's App. at 73, that (a) the majority of the birds processed by OK were dedicated to negotiated, one-year, fixed-price contracts with buyers like Burger King and Wendy's, and as a result, was unable to reduce its production significantly, (b) OK only held a 2% market share in the United States and was thus unable to control prices or eliminate competition, and (c) the average retail price per pound for whole chickens at the time of trial was lower than it was in 2001.  Id. at 19-20.  Nowhere in its summary judgment motion did OK assert the sufficiency of evidence argument it now seeks to assert on appeal.

motions did OK discuss or even mention liability based on asymmetrical

information or housing specifications.[8]

OK first raised these issues in its post-judgment motion for new trial.[9]  The

Growers correctly noted in their response to that motion that, under Tenth Circuit

law, OK waived any right to a new trial on the basis of insufficiency of the

evidence by failing to raise the issues in its Rule 50(a) motions.  "A party may

not circumvent Rule 50(a) by raising for the first time in a post-trial motion issues

not raised in an earlier motion for directed verdict."  United Int'l Holdings, 210

F.3d at 1228.  The Rule 50(a) motion "is a prerequisite to a post-verdict motion

under Rule 50(b).  The renewed motion cannot assert grounds for relief not

asserted in the original motion."  Marshall v. Columbia Lea Reg'l Hosp., 474

F.3d 733, 738 (10th Cir. 2007) (footnote omitted).  Because OK did not address

these two arguments in its Rule 50(a) motion, we will not consider them on

---

[8] Nor were these arguments discussed or mentioned in OK's post-trial
motion for judgment as a matter of law.  That motion instead argued that (a) the
Growers failed to produce any evidence that OK sold its products directly to
consumers, and (b) the Growers' statistical evidence was insufficient to establish
consumer injury.

[9] In its motion for new trial, OK complained for the first time that the
Growers had failed to present sufficient evidence to establish that three of the
practices challenged by the Growers (i.e., "density reduction," "information
sharing," and "building specification control") resulted in consumer injury.
Appellant's App. at 757-762.

23

appeal.[10]

## 4. Admission of Expert Testimony

Next, OK argues that the district court erroneously admitted evidence

presented by the Growers' expert witness, Dr. Taylor.  Under the Federal Rules of

Evidence, the district court must ensure that an expert's testimony is relevant and

reliable.  Daubert v. Merrill Dow Pharm., 509 U.S. 579, 589 (1993).  Federal Rule

of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Generally, there are two separate inquiries in addressing whether a district

court properly admitted an expert's testimony.  First, "we review de novo whether

the district court applied the proper standard and actually performed its

---

[10] Although the district court discussed these arguments on the merits in its denial of OK's post-judgment motion for a new trial, we are not bound by that action.  And, even if we were to ignore OK's procedural default, it would be unnecessary to address OK's arguments on the merits because, by challenging the sufficiency of evidence with respect to only two of the five theories of liability submitted to the jury, it has effectively conceded that sufficient evidence existed to support the jury's general verdict.  See Nanodetex Corp. v. Defiant Tech., 349 F. App'x 312, 317-18 (10th Cir. 2009) ("Because the case was tried using a general verdict, we do not know which theory the jury adopted and consequently must affirm if legally sufficient evidence exists to support either theory.").

gatekeeper role in the first instance." Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003). We then review for an abuse of discretion the manner in which the district court exercises its gatekeeping role in deciding whether to admit or exclude expert testimony. Id. Because the district court has "broad discretion" in deciding whether to admit or exclude such testimony, we "will not disturb the district court's ruling unless it is arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. (internal quotation marks omitted).

OK contends that the district court committed several errors in admitting Taylor's testimony. OK argues that the district court improperly admitted testimony regarding the level of asymmetrical information, the calculation of damages, and causation of consumer injury.

*a. Testimony Regarding Asymmetrical Information*

Beginning with Taylor's testimony regarding asymmetrical information, OK argues that Taylor provided no gauge, test, or data for measuring the severity of the asymmetry. At trial, Taylor testified that the problems of asymmetrical information "are much more severe when it's way out of whack." Appellants' App. at 328. When questioned, Taylor agreed that there is no published economic analysis of what constitutes "way out of whack." Appellants' App. at 331–32.

On appeal, OK argues that it was error to admit this "ipse dixit" conclusion.

25

But at trial, OK did not object to this testimony on those grounds. OK's only objections to the testimony regarding asymmetrical information involved the relevance of the testimony.[11] OK did not object on the grounds of reliability under Rule 702 and Daubert. Because OK did not object to the expert testimony at trial on the same grounds that they argue on appeal, we review only for plain error. See McKenzie v. Benton, 388 F.3d 1342, 1350 (10th Cir. 2004) (reviewing for plain error where party objected to expert testimony on qualification, but argued relevance on appeal).

To establish plain error, OK must demonstrate "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." Morales-Fernandez v. INS, 418 F.3d 1116, 1123–24 (10th Cir. 2005). This final requirement "is an extraordinary, nearly insurmountable burden." Phillips v. Hillcrest Med. Ctr., 244 F.3d 790, 802 (10th Cir. 2001). Notably, OK never mentions the plain error standard in its appellate briefs, nor marshals its arguments accordingly, and "[f]or that reason alone, we [could] conclude [it] has failed to carry the nearly

---

[11] Although OK filed a motion to exclude Taylor's testimony, the district court did not rule on the issue of asymmetrical information, but instead stated that it would "monitor this testimony closely." Appellants' Add. at 34. Thus, it was OK's responsibility to make a timely, specific objection to the particular testimony offered at trial. See Marbled Murrelet v. Babbitt, 83 F.3d 1060, 1066 (9th Cir. 1996) ("[T]he appropriate time to raise Daubert challenges is at trial. By failing to object to evidence at trial and request a ruling on such an objection, a party waives the right to raise admissibility issues on appeal.").

26

insurmountable burden that the plain error standard imposes." Herrera v. City of Albuquerque, 589 F.3d 1064, 1075 (10th Cir. 2009) (citations omitted) (internal quotation marks omitted). Nonetheless, reviewing OK's arguments, it has not met its burden to demonstrate plain error.

Reviewing Taylor's testimony, he did not provide specific data, or a gauge by which to measure the severity of asymmetrical information, which he described as "way out of whack." Even assuming that this was error, OK has not met the high burden of demonstrating plain error resulting in manifest injustice. The jury did not need to rely on Taylor's opinion testimony because the jury had evidence of the information that was actually provided to the Growers and the information allegedly withheld. Additionally, the theory regarding asymmetry of information was only one of five potential theories of liability. Thus, OK has not shown plain error resulting in manifest injustice in admitting Taylor's testimony regarding the asymmetry of information. See McKenzie, 388 F.3d at 1350–51.

*b. Testimony Regarding Damages*

OK further contends that the district court erroneously admitted evidence regarding the measurement of damages. In support, OK appears to make two separate arguments. First, OK suggests that the district court erroneously instructed the jury on damages. Second, OK argues that Taylor's testimony on damages was irrelevant and unreliable.

I. Jury instructions regarding damages

27

Turning to the jury instructions, we review the jury instructions as a whole de novo to determine whether the district court "correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." Martinez v. Caterpillar, Inc., 572 F.3d 1129, 1132 (10th Cir. 2009) (internal quotation marks omitted). We review for abuse of discretion the district court's decision to give a particular instruction. Id. "We reverse only in those cases where we have a substantial doubt whether the jury was fairly guided in its deliberations." Id. (alterations omitted) (internal quotation marks omitted).

The district court instructed the jury on damages in part as follows:

when determining plaintiffs' lost profits, you should compare the amount of profit that plaintiffs would have earned in a fair and competitive market with the amount of profit that plaintiffs have earned. The difference between these two figures is the amount of profits the plaintiffs lost because of defendants' alleged violation of the PSA.

Appellees' Supp. App. at 420. Upon reviewing the jury instructions, we conclude the district court did not err in allowing the jury to calculate damages based on the profits that the Growers actually received in comparison to profits in a hypothetical competitive market.

In competitive injury cases, it is often difficult to measure business damages. See J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981). "The vagaries of the marketplace usually deny us sure knowledge of

28

what plaintiff's situation would have been in the absence of the defendant's antitrust violation." Id. In a typical antitrust competitive injury case, damages are calculated "by comparison of profits, prices and values as affected by the [unlawful act], with what they would have been in its absence under freely competitive conditions." See Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264 (1946) (discussing damages in monopolization under the Sherman Act); see also Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc., 850 F.2d 1286, 1306 (8th Cir. 1988) ("At base, an antitrust plaintiff's damages should reflect the difference between its performance in a hypothetical market free of all antitrust violations and its actual performance in the market infected by the anticompetitive conduct."). We find no error in the district court instructing the jury to compare what the Growers actually received with what they would have received in a competitive marketplace, absent OK's violations of the PSA.

### ii. Testimony calculating damages

Next, OK argues that the district court erred in admitting Taylor's testimony regarding damages. More specifically, OK contends that testimony regarding competitive pay was irrelevant, and Taylor's metric for calculating damages was erroneously admitted.

Beginning with the issue of relevance, OK's argument is without merit. As discussed above, the district court appropriately instructed the jury on calculating damages by comparing profits received and profits in a hypothetical, competitive

29

market. Naturally, testimony regarding underpayment in reference to such a competitive market would be relevant.

Turning to Taylor's metric for calculating damages, OK contends that there were two errors in Taylor's methodology: (1) Dr. Taylor used cost assumptions in a model developed for Alabama, not Oklahoma; and (2) the damages model included the opportunity costs of grower labor.

OK failed to object to Taylor's use of Alabama figures in the damages model. In the pretrial motion to exclude Taylor's testimony, OK mentioned in passing that Taylor used assumptions from Alabama in the motion to exclude his testimony, but it did not argue that the use of data from Alabama was unreliable or improper under Daubert, as is now suggested on appeal. And at trial, OK did not object to Taylor's testimony regarding the use of data from Alabama. Consequently, we review for plain error. McKenzie, 388 F.3d at 1350.

Upon reviewing the record, we conclude that there was no plain error in admitting the testimony regarding damages using data from Alabama. OK contends that the use of data from Alabama has previously been criticized. See Wheeler v. Pilgrim's Pride, Inc., 246 F.R.D. 532, 542–43 (E.D. Tex. 2007). But in Wheeler, the district court noted that the expert made no attempt to compare the Alabama data to the relevant market or members of the class. See id. at 543. Additionally, the expert in Wheeler conceded that he did not use the best information available. See id. In the present case, however, Taylor testified that

30

the Alabama data was "the only source of actual information detail on . . . the out-of-pocket cost for raising broilers." Appellants' App. at 340–41. Further, Taylor also examined the operating costs on an actual OK farm and compared them to the Alabama data. Taylor testified that the Alabama data he used resulted in lower damages than if he used the figure from the actual OK farm. If the calculations are "estimated in any reasonable way" and the expert's assumptions "are not without support in the record, the calculations may be upheld . . . ." Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d 1509, 1526 (10th Cir. 1984) (emphasis omitted) (internal quotation marks omitted). Accordingly, OK has not demonstrated plain error.

Next, we turn to OK's argument that the district court erroneously allowed Taylor to testify about a damages model that included opportunity costs. OK did not object to Taylor's use of opportunity costs in either the motion to exclude Taylor's testimony or during trial, and thus, we review only for plain error. See McKenzie, 388 F.3d at 1350.

OK contends that courts have disapproved of the use of opportunity costs as a matter of law. But this assertion is an extreme overstatement. Courts refer to "opportunity costs" in a wide variety of contexts, often using the term in several different ways. See Fishman v. Estate of Wirtz, 807 F.2d 520, 556 (7th Cir. 1986) ("The economic concept of 'opportunity cost' has been used in a variety of cases as a loose label for any of a number of adjustments to value involving the

31

idea that for every use of one's resources there is an alternative use, with its own return, foregone."). Thus, whether "opportunity costs" are admissible depends on the context of a given case.

OK has not argued how the use of opportunity costs is improper in the calculation of damages using a hypothetical competitive market. Instead, OK relies on two district court cases involving predatory pricing: In re IBM Peripheral EDP Devices Antitrust Litigation, 459 F. Supp. 626, 631 (N.D. Cal. 1978), and Continental Airlines, Inc. v. American Airlines, Inc., 824 F. Supp. 689, 701 (S.D. Tex. 1993). Neither case, however, is relevant to the determination of whether it was plain error to use opportunity costs to calculate damages using a hypothetical competitive market. Therefore, OK has not established it was error, let alone plain error for the district court to admit testimony regarding opportunity costs.

*c. Testimony regarding consumer injury*

OK also argues that Taylor's testimony on causation of consumer injury was inadmissible. Specifically, OK argues that Taylor testified at a professionally impermissible level of confidence, and Taylor erroneously calculated the time difference between when OK decided to produce chickens and when it obtained a price.

At trial, Taylor testified that there was a 71% probability that OK's production has an impact on the nationwide price. Appellants' App. at 316. OK

does not contest the relevance of the evidence or the method used to calculate the relationship between OK's production and nationwide prices, but instead asserts that the 71% confidence level renders the testimony inadmissible. We need not resolve the precise confidence level at which such testimony becomes inadmissible. Even assuming the challenged testimony was inadmissible, it was harmless in the context of all the evidence produced by the Growers. As noted by the Growers, they presented four regression analyses demonstrating actual harm to consumers, and OK does not challenge two of those analyses.

Next, OK argues that the district court erred in admitting Taylor's testimony regarding the relationship between OK's production decisions and average sales prices. Specifically, OK contends that Taylor mistakenly assumed that the decision to produce was made on the day OK delivered chicks to the Growers, rather than when OK chose to hatch the chicks three weeks prior. Therefore, OK argues that Taylor correlated market prices and production levels using the wrong time interval.

Again, OK has failed to properly preserve this issue for appeal. At trial, OK objected to the admission of this evidence, suggesting that there were reliability questions and asked to voir dire the witness. Appellants' App. at 307. The district court refused to allow OK to voir dire Taylor at that time, and instead told OK that it would have the opportunity to bring out issues of reliability on cross-examination. But after cross-examining Taylor, OK never moved to

exclude Taylor's testimony or otherwise requested a ruling on the admissibility of his testimony under Rule 702. Thus, the district court was never asked to make specific findings on the record analyzing the admissibility of Taylor's testimony under Daubert. Accordingly, we review for plain error. See McKenzie, 388 F.3d at 1350. And, after examining the record on appeal, we are not persuaded the admission of this evidence, even if erroneous, resulted in a miscarriage of justice.

### 5. Statute of Limitations

Finally, OK argues that the district court failed to instruct the jury on the statute of limitations. However, OK did not request such an instruction on the record during the jury instruction conference. Where a party fails to make a proper objection to jury instructions, we review for plain error. Greene v. Safeway Stores, Inc., 210 F.3d 1237, 1245 (10th Cir. 2000). "Under that standard, we will affirm unless the instructions were patently, plainly erroneous and prejudicial." Id. (internal quotation marks omitted).

OK contends that the general verdict allowed the jury to find OK liable based on its control over building specifications. According to OK, the named plaintiffs entered into their contracts with OK outside the statute of limitations period, and thus, OK was entitled to an instruction on the statute of limitations. Although the district court noted that OK never raised this specific objection on the record during the jury instruction conference, the district court discussed the statute of limitations argument in denying OK's motion for a new trial. The

34

district court concluded that a statute of limitations instruction was not required because of the continuing harm and speculative damages doctrines.

OK argues that the continuing harm doctrine was rejected in a similar case, citing Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir. 2004). But unlike the plaintiffs in Varner, the Growers did not allege that they were harmed based on an enforcement of the original contract entered before the statute of limitations. Rather, the Growers argued, and provided evidence, that the Growers and OK repeatedly entered new contracts throughout the period of the statute of limitations, and those contracts demanded new building specifications, which the Growers alleged violated the PSA. OK offers no other argument regarding the continuing harm doctrine save for its misplaced reliance on Varner. Therefore, we conclude that OK has failed to demonstrate that the instructions were patently, plainly erroneous and prejudicial.

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Chief Judge

35