(Slip Opinion)     OCTOBER  TERM,  2006     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WEYERHAEUSER CO. *v.* ROSS-SIMMONS HARD-WOOD LUMBER CO., INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 05–381.  Argued November 28, 2006—Decided February 20, 2007

Respondent Ross-Simmons, a sawmill, filed suit under §2 of the Sherman Act, alleging that petitioner Weyerhaeuser drove it out of business by bidding up the price of sawlogs to a level that prevented Ross-Simmons from being profitable.  The District Court, *inter alia,* rejected Weyerhaeuser's proposed predatory-bidding jury instructions that incorporated elements of the test applied to predatory-pricing claims in *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U. S. 209.  The jury returned a verdict against Weyerhaeuser. The Ninth Circuit affirmed, rejecting Weyerhaeuser's argument that *Brooke Group*'s standard should apply to predatory-bidding claims.

*Held:* The test this Court applied to predatory-pricing claims in *Brooke Group* also applies to predatory-bidding claims.  Pp. 4–13.

   (a) Predatory pricing is a scheme in which the predator reduces the sale price of its product hoping to drive competitors out of business and, once competition has been vanquished, raises prices to a supra-competitive level.  *Brooke Group* established two prerequisites to recovery on a predatory-pricing claim: First, a plaintiff must show that the prices complained of are below cost, 509 U. S., at 222, because allowing recovery for above-cost price cutting could chill conduct—price cutting—that directly benefits consumers.  Second, a plaintiff must show that the alleged predator had "a dangerous probability of recouping its investment in below-cost pricing," *id.,* at 224, because without such a probability, it is highly unlikely that a firm would engage in predatory pricing.  The costs of erroneous findings of predatory-pricing liability are quite high because " '[t]he mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition,' " and

therefore, mistaken liability findings would "'"chill the very conduct the antitrust laws are designed to protect."'" *Id.,* at 26. Pp. 4–7.

(b) Predatory bidding involves the exercise of market power on the market's buy, or input, side. To engage in predatory bidding, a purchaser bids up the market price of an input so high that rival buyers cannot survive, thus acquiring monopsony power, which is market power on the buy side of the market. Once a predatory bidder causes competing buyers to exit the market, it will attempt to drive down input prices to reap supracompetitive profits that will at least offset the losses it suffered in bidding up input prices. Pp. 7–8.

(c) Predatory-pricing and predatory-bidding claims are analytically similar. And the close theoretical connection between monopoly and monopsony suggests that similar legal standards should apply to both sorts of claims. Both involve the deliberate use of unilateral pricing measures for anticompetitive purposes and both require firms to incur certain short-term losses on the chance that they might later make supracompetitive profits. More importantly, predatory bidding mirrors predatory pricing in respects deemed significant in *Brooke Group*. Because rational businesses will rarely suffer short-term losses in hopes of reaping supracompetitive profits*, Brooke Group*'s conclusion that "'predatory pricing schemes are rarely tried, and even more rarely successful,'" 509 U. S., at 226, applies with equal force to predatory-bidding schemes. And like the predatory conduct in *Brooke Group*, actions taken in a predatory-bidding scheme are often "'"the very essence of competition,"'" *ibid.,* because a failed predatory-bidding scheme can be a "boon to consumers," see *id.,* at 224. Predatory bidding also presents less of a direct threat of consumer harm than predatory pricing, which achieves ultimate success by charging higher prices to consumers, because a predatory bidder does not necessarily rely on raising prices in the output market to recoup its losses. Pp. 8–12.

(d) Given these similarities, *Brooke Group*'s two-pronged test should apply to predatory-bidding claims. A predatory-bidding plaintiff must prove that the predator's bidding on the buy side caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs. Because the risk of chilling procompetitive behavior with too lax a liability standard is as serious here as it was in *Brooke Group,* only higher bidding that leads to below-cost pricing in the relevant output market will suffice as a basis for predatory-bidding liability. A predatory-bidding plaintiff also must prove that the defendant has a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power. Making such a showing will require "a close analysis of both the scheme alleged by the plaintiff and the [relevant market's] struc-

Syllabus

ture and conditions," 509 U. S., at 226. Pp. 12–13.

    (e) Because Ross-Simmons has conceded that it has not satisfied the *Brooke Group* standard, its predatory-bidding theory of liability cannot support the jury's verdict. P. 13.

411 F. 3d 1030, vacated and remanded.

    THOMAS, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 05–381

_____

## WEYERHAEUSER COMPANY, PETITIONER *v.* ROSS-SIMMONS HARDWOOD LUMBER COMPANY, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[February 20, 2007]

JUSTICE THOMAS delivered the opinion of the Court.

Respondent Ross-Simmons, a sawmill, sued petitioner
Weyerhaeuser, alleging that Weyerhaeuser drove it out of
business by bidding up the price of sawlogs to a level that
prevented Ross-Simmons from being profitable.  A jury
returned a verdict in favor of Ross-Simmons on its mo-
nopolization claim, and the Ninth Circuit affirmed.  We
granted certiorari to decide whether the test we applied to
claims of predatory pricing in *Brooke Group Ltd.* v. *Brown
& Williamson Tobacco Corp.*, 509 U. S. 209 (1993), also
applies to claims of predatory bidding.  We hold that it
does.  Accordingly, we vacate the judgment of the Court of
Appeals.

I

This antitrust case concerns the acquisition of red alder
sawlogs by the mills that process those logs in the Pacific
Northwest.  These hardwood-lumber mills usually acquire
logs in one of three ways.  Some logs are purchased on the
open bidding market.  Some come to the mill through
standing short- and long-term agreements with timber-
land owners.  And others are harvested from timberland

owned by the sawmills themselves. The allegations relevant to our decision in this case relate to the bidding market.

Ross-Simmons began operating a hardwood-lumber sawmill in Longview, Washington, in 1962. Weyerhaeuser entered the Northwestern hardwood-lumber market in 1980 by acquiring an existing lumber company. Weyerhaeuser gradually increased the scope of its hardwood-lumber operation, and it now owns six hardwood sawmills in the region. By 2001, Weyerhaeuser's mills were acquiring approximately 65 percent of the alder logs available for sale in the region. App. 754a, 341a.

From 1990 to 2000, Weyerhaeuser made more than $75 million in capital investments in its hardwood mills in the Pacific Northwest. *Id.,* at 159a. During this period, production increased at every Northwestern hardwood mill that Weyerhaeuser owned. *Id.,* at 160a. In addition to increasing production, Weyerhaeuser used "state-of-the-art technology," *id.,* at 500a, including sawing equipment, to increase the amount of lumber recovered from every log, *id.,* at 500a, 549a. By contrast, Ross-Simmons appears to have engaged in little efficiency-enhancing investment. See *id.,* at 438a–441a.

Logs represent up to 75 percent of a sawmill's total costs. See *id.,* at 169a. And from 1998 to 2001, the price of alder sawlogs increased while prices for finished hardwood lumber fell. These divergent trends in input and output prices cut into the mills' profit margins, and Ross-Simmons suffered heavy losses during this time. See *id.,* at 155a (showing a negative net income from 1998 to 2000). Saddled with several million dollars in debt, Ross-Simmons shut down its mill completely in May 2001. *Id.,* at 156a.

Ross-Simmons blamed Weyerhaeuser for driving it out of business by bidding up input costs, and it filed an antitrust suit against Weyerhaeuser for monopolization and

attempted monopolization under §2 of the Sherman Act. See 26 Stat. 209, as amended, 15 U. S. C. §2 (2000 ed., Supp. IV). Ross-Simmons alleged that, among other anticompetitive acts, Weyerhaeuser had used "its dominant position in the alder sawlog market to drive up the prices for alder sawlogs to levels that severely reduced or eliminated the profit margins of Weyerhaeuser's alder sawmill competition." App. 135a. Proceeding in part on this "predatory-bidding" theory, Ross-Simmons argued that Weyerhaeuser had overpaid for alder sawlogs to cause sawlog prices to rise to artificially high levels as part of a plan to drive Ross-Simmons out of business. As proof that this practice had occurred, Ross-Simmons pointed to Weyerhaeuser's large share of the alder purchasing market, rising alder sawlog prices during the alleged predation period, and Weyerhaeuser's declining profits during that same period.

Prior to trial, Weyerhaeuser moved for summary judgment on Ross-Simmons' predatory-bidding theory. *Id.,* at 6a–24a. The District Court denied the motion. *Id.,* at 58a–69a. At the close of the 9-day trial, Weyerhaeuser moved for judgment as a matter of law, or alternatively, for a new trial. The motions were based in part on Weyerhaeuser's argument that Ross-Simmons had not satisfied the standard this Court set forth in *Brooke Group, supra.* App. 940a–942a. The District Court denied Weyerhaeuser's motion. *Id.,* at 720a, App. to Pet. for Cert. 46a. The District Court also rejected proposed predatory-bidding jury instructions that incorporated elements of the *Brooke Group* test. App. 725a–730a, 978a. Ultimately, the District Court instructed the jury that Ross-Simmons could prove that Weyerhaeuser's bidding practices were anticompetitive acts if the jury concluded that Weyerhaeuser "purchased more logs than it needed, or paid a higher price for logs than necessary, in order to prevent [Ross-Simmons] from obtaining the logs they needed at a

fair price." *Id.,* at 978a. Finding that Ross-Simmons had proved its claim for monopolization, the jury returned a $26 million verdict against Weyerhaeuser. *Id.,* at 967a. The verdict was trebled to approximately $79 million.

Weyerhaeuser appealed to the Court of Appeals for the Ninth Circuit. There, Weyerhaeuser argued that *Brooke Group*'s standard for claims of predatory pricing should also apply to claims of predatory bidding. The Ninth Circuit disagreed and affirmed the verdict against Weyerhaeuser. *Confederated Tribes of Siletz Indians of Ore.* v. *Weyerhaeuser Co.*, 411 F. 3d 1030, 1035–1036 (2005).

The Court of Appeals reasoned that "buy-side predatory bidding" and "sell-side predatory pricing," though similar, are materially different in that predatory bidding does not necessarily benefit consumers or stimulate competition in the way that predatory pricing does. *Id.,* at 1037. Concluding that "the concerns that led the *Brooke Group* Court to establish a high standard of liability in the predatory-pricing context do not carry over to this predatory bidding context with the same force," the Court of Appeals declined to apply *Brooke Group* to Ross-Simmons' claims of predatory bidding. 411 F. 3d, at 1038. The Court of Appeals went on to conclude that substantial evidence supported a finding of liability on the predatory-bidding theory. *Id.,* at 1045. We granted certiorari to decide whether *Brooke Group* applies to claims of predatory bidding. 548 U. S. ___ (2006). We hold that it does, and we vacate the Court of Appeals' judgment.

## II

In *Brooke Group*, we considered what a plaintiff must show in order to succeed on a claim of predatory pricing under §2 of the Sherman Act.[1] In a typical predatory-

—————

[1] *Brooke Group* dealt with a claim under the Robinson-Patman Act, but as we observed, "primary-line competitive injury under the Robinson-Patman Act is of the same general character as the injury inflicted

pricing scheme, the predator reduces the sale price of its product (its output) to below cost, hoping to drive competitors out of business. Then, with competition vanquished, the predator raises output prices to a supracompetitive level. See *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 584–585, n. 8 (1986) (describing predatory pricing). For the scheme to make economic sense, the losses suffered from pricing goods below cost must be recouped (with interest) during the supracompetitive-pricing stage of the scheme. *Id.,* at 588–589; *Cargill, Inc.* v. *Monfort of Colo., Inc.*, 479 U. S. 104, 121–122, n. 17 (1986); see also R. Bork, The Antitrust Paradox 145 (1978). Recognizing this economic reality, we established two prerequisites to recovery on claims of predatory pricing. "First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." *Brooke Group*, 509 U. S., at 222. Second, a plaintiff must demonstrate that "the competitor had . . . a dangerous probabilit[y] of recouping its investment in below-cost prices." *Id.,* at 224.

The first prong of the test—requiring that prices be below cost—is necessary because "[a]s a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control." *Id.,* at 223. We were particularly wary of allowing recovery for above-cost price cutting because allowing such claims could, perversely, "chil[l] legitimate price cutting," which directly benefits consumers. See *id.,* at

———————

by predatory pricing schemes actionable under §2 of the Sherman Act." 509 U. S., at 221. Because of this similarity, the standard adopted in *Brooke Group* applies to predatory-pricing claims under §2 of the Sherman Act. *Id.,* at 222.

223–224; *Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U. S. 328, 340 (1990) ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition"). Thus, we specifically declined to allow plaintiffs to recover for above-cost price cutting, concluding that "discouraging a price cut and . . . depriving consumers of the benefits of lower prices . . . does not constitute sound antitrust policy." *Brooke Group*, *supra*, at 224.

The second prong of the *Brooke Group* test—requiring that there be a dangerous probability of recoupment of losses—is necessary because, without a dangerous probability of recoupment, it is highly unlikely that a firm would engage in predatory pricing. As the Court explained in *Matsushita*, a firm engaged in a predatory-pricing scheme makes an investment—the losses suffered plus the profits that would have been realized absent the scheme—at the initial, below-cost-selling phase. 475 U. S., at 588–589. For that investment to be rational, a firm must reasonably expect to recoup in the long run at least its original investment with supracompetitive profits. *Ibid.; Brooke Group*, 509 U. S., at 224. Without such a reasonable expectation, a rational firm would not willingly suffer definite, short-run losses. Recognizing the centrality of recoupment to a predatory-pricing scheme, we required predatory-pricing plaintiffs to "demonstrate that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it." *Id.,* at 225.

We described the two parts of the *Brooke Group* test as "essential components of real market injury" that were "not easy to establish." *Id.,* at 226. We also reiterated that the costs of erroneous findings of predatory-pricing liability were quite high because "'[t]he mechanism by

which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition,'" and therefore, mistaken findings of liability would "'"chill the very conduct the antitrust laws are designed to protect."'" *Ibid.* (quoting *Cargill, supra*, at 122, n. 17).

## III

Predatory bidding, which Ross-Simmons alleges in this case, involves the exercise of market power on the buy side or input side of a market. In a predatory-bidding scheme, a purchaser of inputs "bids up the market price of a critical input to such high levels that rival buyers cannot survive (or compete as vigorously) and, as a result, the predating buyer acquires (or maintains or increases its) monopsony power." Kirkwood, Buyer Power and Exclusionary Conduct, 72 Antitrust L. J. 625, 652 (2005) (hereinafter Kirkwood). Monopsony power is market power on the buy side of the market. Blair & Harrison, Antitrust Policy and Monopsony, 76 Cornell L. Rev. 297 (1991). As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a "buyer's monopoly." See *id.,* at 301, 320; Piraino, A Proposed Antitrust Approach to Buyers' Competitive Conduct, 56 Hastings L. J. 1121, 1125 (2005).

A predatory bidder ultimately aims to exercise the monopsony power gained from bidding up input prices. To that end, once the predatory bidder has caused competing buyers to exit the market for purchasing inputs, it will seek to "restrict its input purchases below the competitive level," thus "reduc[ing] the unit price for the remaining input[s] it purchases." Salop, Anticompetitive Overbuying by Power Buyers, 72 Antitrust L. J. 669, 672 (2005) (hereinafter Salop). The reduction in input prices will lead to "a significant cost saving that more than offsets the profit[s] that would have been earned on the output." *Ibid.* If all

goes as planned, the predatory bidder will reap monopsonistic profits that will offset any losses suffered in bidding up input prices.[2]  (In this case, the plaintiff was the defendant's competitor in the input-purchasing market.  Thus, this case does not present a situation of suppliers suing a monopsonist buyer under §2 of the Sherman Act, nor does it present a risk of significantly increased concentration in the market in which the monopsonist sells, *i.e.*, the market for finished lumber.)

## IV
### A

Predatory-pricing  and  predatory-bidding  claims  are analytically similar.  See Hovenkamp, The Law of Exclusionary Pricing, 2 Competition Policy Int'l, No. 1, pp. 21, 35 (Spring 2006).  This similarity results from the close theoretical connection between monopoly and monopsony. See Kirkwood 653 (describing monopsony as the "mirror image" of monopoly); *Khan* v. *State Oil Co.*, 93 F. 3d 1358, 1361 (CA7 1996) ("[M]onopsony pricing . . . is analytically the same as monopoly or cartel pricing and [is] so treated by the law"), vacated and remanded on other grounds, 522 U. S. 3 (1997); *Vogel* v. *American Soc. of Appraisers*, 744 F. 2d 598, 601 (CA7 1984) ("[M]onopoly and monopsony are symmetrical distortions of competition from an economic standpoint"); see also Hearing on Monopsony Issues in Agriculture: Buying Power of Processors in Our Nation's Agricultural Markets before the Senate Committee on the Judiciary, 108th Cong., 1st Sess., 3 (2004).  The

---

[2] If the predatory firm's competitors in the input market and the output market are the same, then predatory bidding can also lead to the bidder's acquisition of monopoly power in the output market.  In that case, which does not appear to be present here, the monopsonist could, under certain market conditions, also recoup its losses by raising output prices to monopolistic levels.  See Salop 679–682 (describing a monopsonist's predatory strategy that depends upon raising prices in the output market).

kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization. Cf. Noll, "Buyer Power" and Economic Policy, 72 Antitrust L. J. 589, 591 (2005) ("[A]symmetric treatment of monopoly and monopsony has no basis in economic analysis").

Tracking the economic similarity between monopoly and monopsony, predatory-pricing plaintiffs and predatory-bidding plaintiffs make strikingly similar allegations. A predatory-pricing plaintiff alleges that a predator cut prices to drive the plaintiff out of business and, thereby, to reap monopoly profits from the output market. In parallel fashion, a predatory-bidding plaintiff alleges that a predator raised prices for a key input to drive the plaintiff out of business and, thereby, to reap monopsony profits in the input market. Both claims involve the deliberate use of unilateral pricing measures for anticompetitive purposes.[3] And both claims logically require firms to incur short-term losses on the chance that they might reap supracompetitive profits in the future.

B

More importantly, predatory bidding mirrors predatory pricing in respects that we deemed significant to our analysis in *Brooke Group*. In *Brooke Group*, we noted that "'predatory pricing schemes are rarely tried, and even

---

[3] Predatory bidding on inputs is not analytically different from predatory overbuying of inputs. Both practices fall under the rubric of monopsony predation and involve an input purchaser's use of input prices in an attempt to exclude rival input purchasers. The economic effect of the practices is identical: input prices rise. In a predatory-bidding scheme, the purchaser causes prices to rise by offering to pay more for inputs. In a predatory-overbuying scheme, the purchaser causes prices to rise by demanding more of the input. Either way, input prices increase. Our use of the term "predatory bidding" is not meant to suggest that different legal treatment is appropriate for the economically identical practice of "predatory overbuying."

more rarely successful.'"  509 U. S., at 226 (quoting *Matsushita*, 475 U. S., at 589).  Predatory pricing requires a firm to suffer certain losses in the short term on the chance of reaping supracompetitive profits in the future. *Id.,* at 588–589.  A rational business will rarely make this sacrifice.  *Ibid.*  The same reasoning applies to predatory bidding.  A predatory-bidding scheme requires a buyer of inputs to suffer losses today on the chance that it will reap supracompetitive profits in the future.  For this reason, "[s]uccessful monopsony predation is probably as unlikely as successful monopoly predation." R. Blair & J. Harrison, Monopsony 66 (1993).

And like the predatory conduct alleged in *Brooke Group*, actions taken in a predatory-bidding scheme are often """"the very essence of competition.""""  509 U. S., at 226 (quoting *Cargill,* 479 U. S., at 122, n. 17, in turn quoting *Matsushita*, *supra*, at 594).  Just as sellers use output prices to compete for purchasers, buyers use bid prices to compete for scarce inputs.  There are myriad legitimate reasons—ranging from benign to affirmatively procompetitive—why a buyer might bid up input prices.  A firm might bid up inputs as a result of miscalculation of its input needs or as a response to increased consumer demand for its outputs.  A more efficient firm might bid up input prices to acquire more inputs as a part of a procompetitive strategy to gain market share in the output market.  A firm that has adopted an input-intensive production process might bid up inputs to acquire the inputs necessary for its process.  Or a firm might bid up input prices to acquire excess inputs as a hedge against the risk of future rises in input costs or future input shortages. See Salop 682–683; Kirkwood 655.  There is nothing illicit about these bidding decisions.  Indeed, this sort of high bidding is essential to competition and innovation on the

buy side of the market.[4]

*Brooke Group* also noted that a failed predatory-pricing scheme may benefit consumers. 509 U. S., at 224. The potential benefit results from the difficulty an aspiring predator faces in recouping losses suffered from below-cost pricing. Without successful recoupment, "predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced." *Ibid.* Failed predatory-bidding schemes can also, but will not necessarily, benefit consumers. See Salop 677–678. In the first stage of a predatory-bidding scheme, the predator's high bidding will likely lead to its acquisition of more inputs. Usually, the acquisition of more inputs leads to the manufacture of more outputs. And increases in output generally result in lower prices to consumers.[5] *Id.,* at 677; R. Blair & J. Harrison, *supra,* at 66–67. Thus, a failed predatory-bidding scheme can be a "boon to consumers" in the same way that we considered a predatory-pricing scheme to be. See *Brooke Group, supra,* at 224.

In addition, predatory bidding presents less of a direct threat of consumer harm than predatory pricing. A predatory-pricing scheme ultimately achieves success by charging higher prices to consumers. By contrast, a predatory-bidding scheme could succeed with little or no effect on consumer prices because a predatory bidder does not necessarily rely on raising prices in the output market to recoup its losses. Salop 676. Even if output prices remain constant, a predatory bidder can use its power as the

———————

[4] Higher prices for inputs obviously benefit existing sellers of inputs and encourage new firms to enter the market for input sales as well.

[5] Consumer benefit does not necessarily result at the first stage because the predator might not use its excess inputs to manufacture additional outputs. It might instead destroy the excess inputs. See Salop 677, n. 22. Also, if the same firms compete in the input and output markets, any increase in outputs by the predator could be offset by decreases in outputs from the predator's struggling competitors.

predominant buyer of inputs to force down input prices and capture monopsony profits. *Ibid.*

C

The general theoretical similarities of monopoly and monopsony combined with the theoretical and practical similarities of predatory pricing and predatory bidding convince us that our two-pronged *Brooke Group* test should apply to predatory-bidding claims.

The first prong of *Brooke Group*'s test requires little adaptation for the predatory-bidding context. A plaintiff must prove that the alleged predatory bidding led to below-cost pricing of the predator's outputs. That is, the predator's bidding on the buy side must have caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs. As with predatory pricing, the exclusionary effect of higher bidding that does not result in below-cost output pricing "is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate" procompetitive conduct. 509 U. S., at 223. Given the multitude of procompetitive ends served by higher bidding for inputs, the risk of chilling procompetitive behavior with too lax a liability standard is as serious here as it was in *Brooke Group*. Consequently, only higher bidding that leads to below-cost pricing in the relevant output market will suffice as a basis for liability for predatory bidding.

A predatory-bidding plaintiff also must prove that the defendant has a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power. Absent proof of likely recoupment, a strategy of predatory bidding makes no economic sense because it would involve short-term losses with no likelihood of offsetting long-term gains. Cf. *id.,* at 224 (citing *Matsushita*, 475 U. S., at 588–589). As with predatory pricing, making a showing on the recoupment

prong will require "a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market." *Brooke Group, supra*, at 226.

Ross-Simmons has conceded that it has not satisfied the *Brooke Group* standard. Brief for Respondent 49; Tr. of Oral Arg. 49. Therefore, its predatory-bidding theory of liability cannot support the jury's verdict.

## V

For these reasons, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*