RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0200p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ENERGY CONVERSION DEVICES LIQUIDATION TRUST, By and Through Its Liquidating Trustee, John Madden,

      *Plaintiff-Appellant*,

  *v.*

TRINA SOLAR LIMITED; TRINA SOLAR (U.S.), INC.; YINGLI GREEN ENERGY HOLDING COMPANY LIMITED; YINGLI GREEN ENERGY AMERICAS, INC.; SUNTECH POWER HOLDINGS CO., LTD.; SUNTECH AMERICA, INC.,

      *Defendants-Appellees*.

No. 15-2130

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cv-14241—Robert H. Cleland, District Judge.

Argued:  June 15, 2016

Decided and Filed:  August 18, 2016

Before:  SILER, ROGERS, and SUTTON, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  W. Gordon Dobie, WINSTON & STRAWN LLP, Chicago, Illinois, for Appellant. Daniel E. Laytin, P.C., KIRKLAND & ELLIS LLP, Chicago, Illinois, for Appellees.  **ON BRIEF:**  W. Gordon Dobie, William C. O'Neil, Kathryn W. Bayer, WINSTON & STRAWN LLP, Chicago, Illinois, for Appellant.  Daniel E. Laytin, P.C., Leonid Feller, James R.P. Hileman, KIRKLAND & ELLIS LLP, Chicago, Illinois, Matthew J. Reilly, Karen M. Gift, SIMPSON THACHER & BARTLETT LLP, Washington, D.C., Jerome S. Fortinsky, SHEARMAN & STERLING LLP, New York, New York, Mikael A. Abye, SHEARMAN & STERLING LLP, San Francisco, California, Catherine T. Dobrowitsky, RIVENOAK LAW GROUP, P.C., Troy, Michigan, Jonathan C. Sanders, SIMPSON THACHER & BARTLETT LLP, Palo Alto, California, Patrick Seyferth, BUSH SEYFERTH & PAIGE, PLLC, Troy, Michigan, for Appellees.

1

———————

**OPINION**

———————

SUTTON, Circuit Judge.   Consumers benefit when market competition leads to lower prices.   Competitors do not.   Because antitrust law protects "competition, not competitors," *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962), courts are leery of antitrust claims brought by competitors alleging only that their rivals lowered prices and forced them out of business.

That is the claim Energy Conversion Devices pursues.   It alleges that three solar-panel producers agreed to decrease prices to below-cost levels and, by doing so, drove the company into bankruptcy.   Missing from the complaint is any allegation that the competitors not only agreed to lower prices but also planned to earn back what they lost—to recoup the losses by charging anti-competitive prices in a cornered market.   In the absence of such an allegation or any willingness to prove a reasonable prospect of recoupment, the district court correctly rejected the claim on the pleadings.   We affirm.

I.

As is always the case in reviewing a dismissal under Civil Rule 12(b)(6), we accept the facts as Energy Conversion, the plaintiff, has pleaded them.

Solar energy is not new.   Seeking to reduce dependence on fossil fuels (and in some instances seeking to save money in the process), businesses and homeowners sometimes install solar panels on their roofs.   Rooftop solar systems are not one type fits all.   Two technologies are available for commercial and industrial purchasers.   The older, conventional technology uses "[p]olysilicon-based" "flat" panels. R. 1 at 14.   The newer technology uses "flexible thin-film silicon" panels. *Id.*   Thin-film panels produce more electricity, are easier to install, and maintain their performance longer after the sun sets or is eclipsed by clouds.

At the time of the relevant events in this case, Suntech Power, Trina Solar, and Yingli Green Energy, all based in China, produced conventional panels.   Energy Conversion, along with

a number of other American manufacturers, produced the newer thin-film panels. The two technologies competed, each obtaining significant sales in the American market for commercial and industrial rooftops. Suntech reported up to $750 million in annual sales in that market in recent years, Trina $440 million, Yingli $340 million, and Energy Conversion over $300 million.

In the absence of restraints on trade, competition rarely is static. So too in this industry. The Chinese producers sought greater market shares. They agreed to export more products to the United States and to sell them below cost. A host of entities supported their endeavor. Suppliers provided discounts on silicon, a trade association facilitated cooperation, and the Chinese government provided below-cost financing. Between 2008 and 2011, the average selling prices of Suntech, Trina, and Yingli's panels fell over 60%.

The agreement took a toll on some domestic producers of solar panels. Struggling American manufacturers sought refuge, turning first to the Department of Commerce and the International Trade Commission, the agencies that administer this country's international trade laws. *See generally* 19 U.S.C. §§ 1671–1677n. The agencies found that the Chinese firms had harmed American industry through illegal dumping. *See Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 100 F. Supp. 3d 1314, 1318–19 (Ct. Int'l Trade 2015); 80 Fed. Reg. 40,998 (July 14, 2015); 77 Fed. Reg. 31,309 (May 25, 2012). As a result, the agencies assessed substantial tariffs on several manufacturers, including Suntech, Trina, and Yingli.

The American solar-panel manufacturers nonetheless continued to suffer. Over twenty firms, including Energy Conversion, filed for bankruptcy or closed their operations. R. 1 at 17–18. As of 2012, shortly after Energy Conversion filed its Chapter 11 petition, there were still roughly thirty producers of solar panels in the United States. *See* Int'l Energy Agency, National Survey Report of PV Power Applications in the United States 2012, at 14 tbl.6 (2013), *available at* http://goo.gl/BJnsJq.

Energy Conversion turned from the executive branch to the judicial branch for additional relief. It filed this lawsuit in the Eastern District of Michigan. Invoking § 1 of the Sherman Act, 15 U.S.C. § 1, and its Michigan equivalent, Mich. Comp. Laws § 445.772, the company sought nearly $3 billion in treble damages. Its complaint boiled down to the allegation that the three

Chinese companies had unlawfully conspired "to sell Chinese manufactured solar panels at unreasonably low or below cost prices . . . in order to destroy an American industry." *Id.* at 29. Because this allegation did not state that Suntech, Trina, and Yingli could or would recoup their losses by charging monopoly prices after they drove their competitors from the field, the district court dismissed the claim with prejudice. No. 13-14241, 2014 WL 5511517, at *3–7 (E.D. Mich. Oct. 31, 2014). And because the legal requirements of the Michigan antitrust statute mirror those of its federal cousin, the district court did the same for the state law claim. *Id.* at *7.

After the district court's ruling, Energy Conversion asked the court for permission to amend its complaint to add a recoupment allegation. The court rejected the request.

## II.

On appeal, Energy Conversion argues that the district court erred (1) in dismissing the complaint for failure to plead that the Chinese companies would recoup their losses and (2) in preventing Energy Conversion from filing an amended complaint that added this allegation.

## A.

The Sherman Act contains two prohibitions. Act of July 2, 1890, ch. 647, 26 Stat. 209. The first declares illegal "[e]very contract, combination . . . , or conspiracy . . . in restraint of trade." 15 U.S.C. § 1. As suggested by the words "contract," "combination," and "conspiracy," § 1 claims require two or more defendants. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). Here are a few types of claims, for illustrative purposes, recognized under this provision: "price fixing" between competitors, *see United States v. Trenton Potteries Co.*, 273 U.S. 392, 396–98 (1927); unreasonable "vertical" agreements between a supplier and its distributors, *see Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 881–82 (2007); "boycotts" of a seller by a group of buyers, *see FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 421–24 (1990); and "predatory pricing," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584 n.8, 588–93 (1986).

The second prohibition punishes any "person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize"

commerce. 15 U.S.C. § 2. As the language of this provision suggests, a plaintiff may bring a § 2 claim against a single monopolist (a "person who shall monopolize") or against two or more (those who "combine or conspire . . . to monopolize"). *Am. Needle*, 560 U.S. at 190. Here are a few types of claims, for illustrative purposes, recognized under this provision: exclusionary conduct that allows a monopoly to unfairly maintain its position, *see Lorain Journal Co. v. United States*, 342 U.S. 143, 153–55 (1951); "tying" products together so a monopoly in one market becomes a monopoly in two, *see Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 464, 480–86 (1992); and "predatory pricing," *see Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993).

1.

It is common ground that a predatory-pricing claim under § 2 requires the plaintiff to plead and prove (1) that the defendants charged below-cost prices, *Brooke Grp.*, 509 U.S. at 222; and (2) that they "had a reasonable prospect . . . of recouping [their] investment in below-cost prices," *id.* at 224. Had Energy Conversion filed this claim under § 2, the parties agree that we would have to dismiss it on the pleadings. The complaint alleges only that the three defendants charged below-cost prices, not that they had a fair prospect of recouping their investment by later charging non-competitive prices.

The question at hand is whether a § 1 predatory-pricing claim contains these same two requirements. Energy Conversion concedes that one requirement (below-cost prices) applies to both claims but not the other (recoupment).

Both claims—§ 1 and § 2 claims—require below-cost pricing *and* a reasonable prospect of recoupment for several reasons.

*First*, the explanation for applying the two requirements to § 2 claims applies with equal force to § 1 claims. Predatory-pricing claims of any sort usually contain an allegation that a rival "reduce[d] the sale price of its product[s] . . . to below cost, hoping to drive competitors out of business." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318 (2007). The problem with that sort of allegation—by itself—is that the conduct claimed to be illegal looks a lot like the "robust competition" that the antitrust statutes "serve[] to promote."

*N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1109 (2015).  Yes, "cutting prices in order to increase business" may put bottom-line pressure on competitors or indeed drive some competitors out of business; but lowering prices to increase market share, usually a zero-sum game, is "the essence of competition."  *Matsushita*, 475 U.S. at 594.

At their core, the antitrust laws are a "consumer welfare prescription," Robert Bork, The Antitrust Paradox 66 (1978), making them unconcerned with low prices (even below-cost prices) that will remain low.  That's why courts have "carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low."  *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 451 (2009).  It does not suffice for a plaintiff to allege only that "the defendant has tried to knock out other businesses"; the plaintiff must show that "the means it has employed to that end are likely to . . . injure consumers."  *R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 696 (7th Cir. 2006).  And that requires the plaintiff to show below-cost prices *and* recoupment.  *Brooke Grp.*, 509 U.S. at 222, 224.  Else, the adoption of low prices leads only to more low prices—a benefit, not a burden, for consumers.

Recoupment looks at what happens after low prices have "vanquished" the competition, when the "predator" can hope to "raise[] . . . prices" to a monopoly level in order to make back "with interest" "the losses suffered from pricing goods below cost."  *Weyerhaeuser*, 549 U.S. at 318.  The possibility of recoupment is what makes the choice to "forgo profits" "rational," and it's what makes the battle of attrition caused by predatory pricing worth the wait and the cost. *Matsushita*, 475 U.S. at 588–89.  Unless low prices today will come with high prices tomorrow, only good things happen for consumers.  They receive the "boon" of lower prices, "consumer welfare is enhanced," and no antitrust concerns arise.  *Brooke Grp.*, 509 U.S. at 224.  The antitrust laws after all should not lightly be used to impose judgments that require defendants to *increase* prices.

There is no sound reason to impose a recoupment requirement in the context of § 2 claims but not § 1 claims.  If, as the Supreme Court has explained, a cognizable predatory-pricing claim requires below-cost pricing and recoupment in the one setting, there is no basis for ignoring it in the other.  The point of adding these requirements to the wide-textured language of the Sherman Act is to screen out some claims—those that will do more harm than good for

consumers and those that enable "the harmful habit" of courts and law enforcement to "see[] predation in behavior that is actually vigorously competitive." Bork, *supra*, at 148. If anti-competitive conduct in a low-price claim requires both elements in one setting, it requires them in the other.

*Second*, any other approach would destroy the § 2 requirement in multi-defendant claims. Why bring such a claim under § 2 if the plaintiff can dispense with the recoupment requirement—as a matter of pleading, proof in discovery, and proof at trial—by the expedient of bringing a predatory-pricing claim under § 1? There is no good reason. The upshot of plaintiff's contrary position is to destroy the recoupment requirement in § 2.

Nor would it make any sense to impose the requirement only in § 2 claims. A predatory-pricing scheme undertaken by a *single firm*, the kind actionable only under § 2, is "general[ly] implausib[le]." *Brooke Grp.*, 509 U.S. at 227; *see also Weyerhaeuser*, 549 U.S. at 323. A predatory-pricing *conspiracy*, actionable under either § 1 or § 2, is "incalculably more difficult to execute." *Matsushita*, 475 U.S. at 590. The alleged conspiracy not only must allocate the losses caused by below-cost pricing, but it also must police against free-riding conspirators. Every individual conspirator wants to be around when the conspiracy succeeds, but each one has every reason to shirk its duty to price below cost. If enough participants cheat in that way, the conspiracy never succeeds. *Id.* No such problem arises with the single-firm predatory-pricing scheme. How strange to include a recoupment requirement where it is needed least (a single-firm defendant) and excuse the requirement where it is needed most (multi-firm defendants).

*Third*, no Supreme Court decision supports Energy Conversion's argument and several strongly suggest, if not hold, that both requirements apply to both sections of the Sherman Act. Start with *Matsushita*, a case filed under § 1 and § 2 of the Sherman Act. American manufacturers of television sets alleged that Japanese competitors conspired to set low prices for television sets sold in the United States. 475 U.S. at 577–78. The Supreme Court did not draw any distinction between the two types of claims in establishing the prerequisites of a claim. "The success of any predatory scheme," it said, "depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain. Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a

significant period of time, '[t]he predator must make a substantial investment with no assurance that it will pay off.' For this reason, there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful." 475 U.S. at 589 (quoting Frank H. Easterbrook, *Predatory Strategies and Counterstrategies*, 48 U. Chi. L. Rev. 263, 268 (1981)). A predatory-pricing scheme, the Court added, "makes sense only if petitioners can recoup their losses. In light of the large number of firms involved here, petitioners can achieve this only by engaging in some form of price fixing *after* they have succeeded in driving competitors from the market." *Id.* at 592 n.16. In all ways, *Matsushita*, a summary judgment case, treats predatory-pricing claims under both sections of the Sherman Act the same.

Seven years later, *Brooke Group* clarified that below-cost pricing and recoupment are elements of a § 2 claim that must be proved at trial. 509 U.S. at 222–27. No decision of the Supreme Court says, or even suggests, that these requirements for a predatory-pricing claim apply in full to a § 2 claim but in half to a § 1 claim. Why a § 1 low-price claim would import one requirement from *Brooke Group* but not the other, as Energy Conversion maintains, is beyond us.

*Fourth*, our court has followed these cues. In *Superior Production Partnership v. Gordon Auto Body Parts Co.*, 784 F.3d 311 (6th Cir. 2015), we addressed a predatory-pricing claim filed under § 1 and § 2. "[W]e think it best," the court said, "to infer these same elements"—below-cost pricing and recoupment—"in a § 1 predatory pricing claim." *Id.* at 320. A claimant thus "must grapple with these concepts in proving its case under § 1"—a requirement just as relevant at the pleading stage of a case as at the summary judgment and proof stages of a case. *Id.*

*Fifth*, all other appellate authority points in the same direction. After *Brooke Group*, every circuit to consider the question has required the elements of § 2 predatory-pricing claims in similar claims under § 1 or (like *Matsushita*) has not distinguished between the two provisions. *See, e.g., Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 401–02, 408–09 (3d Cir. 2016); *Felder's Collision Parts, Inc. v. All Star Advertising Agency, Inc.*, 777 F.3d 756, 759–60 (5th Cir. 2015); *Wallace v. Int'l Bus. Machines Corp.*, 467 F.3d 1104, 1106–08 (7th Cir. 2006); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–34, 1443–44 (9th Cir. 1995); *Multistate Legal*

*Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1548–49 (10th Cir. 1995). The leading treatise writers have reached the same conclusion. *See* 12 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2007b1 (Supp. 1999); *see also* William L. Greene et al., Predatory Pricing 20 (ABA Antitrust Section, Monograph No. 22, 1996).

Measured by this test, Energy Conversion's claim fails. It never alleges that Suntech, Trina, and Yingli had a reasonable prospect of recouping their losses. The most the company included in its complaint was a reference to the possibility that, at some future date, "American consumers will pay more than they would in a competitive market." R. 1 at 27. The complaint gave no further details about how this would occur, when this would occur, why this would occur, or whether this *could* occur given the ease of access (or barriers to entry) to the solar-panel market. We thus do not know whether the Chinese companies' conspiracy extended past the point of cutting prices or how the conspiracy otherwise ensured that Suntech, Trina, and Yingli would recover what they had lost in setting "unreasonably low and/or below-cost prices." *Id.* at 2. The district court therefore correctly concluded that Energy Conversion had failed to plead recoupment adequately. 2014 WL 5511517, at *6–7. Notably, Energy Conversion hinted as much during a hearing in the district court. And it admitted as much at oral argument in our court, acknowledging that it had not pled recoupment and had no duty to show it would occur. The district court properly dismissed the case.

Energy Conversion offers several rejoinders, each unconvincing.

It first argues that the label "predatory pricing" and the requirement of proof of recoupment attached to it applies only to claims under § 2 of the Sherman Act, not § 1. That is word play. The Supreme Court has already used "predatory pricing" to describe claims in each setting, whether filed under one section or the other. *Matsushita*, 475 U.S. at 584 n.8, 588–93. And this court too has rejected any such distinction. *Superior Prod.*, 784 F.3d at 320. It is also impossible to square this argument with Energy Conversion's concession that one element of predatory pricing *does* apply here, even though the primary case on which it relies discusses neither element. *See Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 348 (1982).

It next points out that the Northern District of California concluded in parallel litigation that a "claim under § 1 of the Sherman Act is [not] subject to dismissal for failing to plead a likelihood of recoupment." *Solyndra Residual Trust ex rel. Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1042 (N.D. Cal. 2014). "The recoupment requirement," the court concluded (in a five-sentence analysis), "derives directly from the Supreme Court's insistence that § 2 claims be supported by a showing of monopolization or the dangerous threat of monopolization." *Id.* The court may be right that § 2 claims always require some proof of monopolization. But it is not right that monopolization is the only source of the recoupment requirement in predatory-pricing claims. Recoupment, to repeat just one reason, ensures that *any* claim bottomed on low prices involves an actual harm to consumers through an eventual increase in prices. *See Wallace*, 467 F.3d at 1106–07. Whether in a § 1 or § 2 predatory-pricing claim, the recoupment requirement ensures that antitrust suits themselves do not "interfere with the achievement of the Sherman Act's basic and important low price objectives." *Monahan's Marine, Inc. v. Bos. Whaler, Inc.*, 866 F.2d 525, 527 (1st Cir. 1989) (Breyer, J.).

Energy Conversion adds that, even if § 1 contains a recoupment requirement in predatory-pricing claims, all that is required in the complaint is a "plausible" showing that a price-fixing conspiracy existed between Suntech, Trina, and Yingli. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Recoupment thus becomes relevant only after discovery, so the argument goes.

But this position misunderstands the structure of federal civil litigation. To survive a motion to dismiss, a complaint must "state[] a plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), which requires that the complaint "show[] that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2). If proof of recoupment is required to succeed on the claim, allegations of recoupment must appear *in the complaint* to show an entitlement to relief. During discovery, the plaintiff must show that there is factual support for each component of the claim or it will be rejected as a matter of law on summary judgment. At trial, the jury will be instructed on each component of the claim and will resolve any material factual disputes related to the claim. Whether at the complaint stage of the case, the discovery stage, or the trial stage, the plaintiff must address each aspect of the claim. As the master of the complaint, the plaintiff

may decide what claims to bring and how to prove them. But it cannot avoid responsibility for dealing with each aspect of the claim at each phase of the case.

Energy Conversion insists that the alleged conspiracy is economically rational (and worthy of prohibition) even if the conspirators never planned to make back their losses. Because Suntech, Trina, and Yingli are all Chinese companies and because China is a "non-market economy," the company argues, the three conspirators "had little interest in making a profit" but instead priced at unprofitable levels "to eliminate American competition and maintain full employment in Chinese factories." Appellant's Br. 32. It's not clear that this is what's happening, given that each company is listed on the New York Stock Exchange, and given that one company has filed for bankruptcy under American law. But if this is what's happening, it's not recoupment. It shows only that the Chinese companies, impervious to the profit motive, are happy to *maintain* low prices. That's a form of charity, not a use of monopoly power to lower production and raise prices. The antitrust laws, as opposed to the statutory prohibition on dumping, do "not pose an obstacle" to the "inept," the happy-go-lucky, indeed the generous, "predat[or]" who sells below cost, benefits consumers, and finds itself unable to recoup—or uninterested in recouping—its losses. *Superior Prod.*, 784 F.3d at 324 n.5. Because Energy Conversion failed to plead recoupment in bringing this § 1 claim, the district court correctly dismissed the complaint.

2.

Even if Energy Conversion managed to clear this hurdle, it would face another, related obstacle. Every private antitrust plaintiff, including those challenging an agreement as unlawful under § 1, must include in its complaint allegations of "antitrust injury." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc); *see Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 339–40 (1990). This requirement is not an element of a specific substantive prohibition such as § 1, but instead derives from the general antitrust damages right of action in § 4 of the Clayton Act. 15 U.S.C. § 15; *see Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–10 (1986). The requirement ensures that private plaintiffs bring claims "of the type the antitrust laws were intended to prevent and that flow[] from that which makes defendants' acts

unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). And it ensures the plaintiff is a "proper" enforcer of those laws. *Cargill*, 479 U.S. at 111 n.6.

Energy Conversion has not pleaded a cognizable antitrust injury for reasons that ought to be clear by now. "[L]ower aggregate prices in the market" "enhance[]" "consumer welfare." *Brooke Grp.*, 509 U.S. at 224. The antitrust laws are a "consumer welfare prescription," *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (quoting Bork, *supra*, at 66), meaning a conspiracy that drops prices, but does not intend to raise them later in order to recoup the losses, does not cause injury "of the type the antitrust laws were intended to prevent," *Brunswick*, 429 U.S. at 489.

This conclusion is of a piece with decisions from this court and the Supreme Court. We concluded that a competitor could not show antitrust injury in a § 2 claim complaining of low prices without an allegation that the defendant had predatorily priced—selling "below cost" *and* having "the goal of recouping its losses by charging monopolistic prices later." *NicSand*, 507 F.3d at 451–52. Even if a supplier had agreed with its distributors to lower prices, the Supreme Court similarly concluded, a rival seller could not show antitrust injury in a § 1 claim unless the agreement "result[ed] in predatory pricing." *Atl. Richfield*, 495 U.S. at 339. In those cases, as in this one, antitrust injury requires not just low pricing but predatory pricing. What makes pricing a form of predation is not the downswing in prices but the gouging upswing in prices after the competition has been eliminated or disciplined. Otherwise, the predator is no less a victim, indeed more of a victim, than the target. Bork, *supra*, at 144–59. Any other approach runs the risk of "chill[ing] the very [price-cutting] conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594; *see Atl. Richfield*, 495 U.S. at 338, 340–41; *NicSand*, 507 F.3d at 452.

Energy Conversion offers a potential way around the recoupment requirement in the antitrust injury context, trying to create a decreased choice/less innovation alternative in its place. The low prices charged by Suntech, Trina, and Yingli, it contends, show antitrust injury because they hurt the American solar-panel industry, leading to "reduced consumer choice and loss of innovation." Appellant's Br. 42.

Yet recoupment is not one item on a menu of ways to show that low prices hurt competition and consumers. It is the only way. "Low prices," one leading author has noted, "are a princip[al] if not the primary goal of antitrust policy." Herbert Hovenkamp, Federal Antitrust Policy § 8.1 (4th ed. 2011). Yes, low prices on their own may lead to market inefficiencies in some cases. But a loss of consumer choice is often anything but anti-competitive. As it became available and affordable, gunpowder largely put the sword industry out of business. The Pony Express could not have competed with Federal Express. Netflix made Blockbuster less relevant. Newer, cheaper, better technology frequently makes old technology unavailable, even to consumers who preferred the old ways and the old technology.

The same reasoning applies here. And that is so even if Suntech, Trina, and Yingli's low prices forced "technologically superior" solar panels off the market. R. 1 at 17. Companies compete not only over the quality of their products but also over their prices. Innovation need not be solely about better technology; it can also be about cost reduction. In the solar-panel market, consumers apparently preferred the quality-price combination offered by the Chinese companies to the combination offered by Energy Conversion and (some of) its compatriots. The result, even if it came out of an agreement that harmed Energy Conversion, amounted to a triumph of consumer choice, not a limitation on it. *Cf. NicSand*, 507 F.3d at 456; *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1000 (6th Cir. 1999).

Energy Conversion points us to caselaw saying that a reduction in consumer choice can show anti-competitive harm. But none of these cases concerns allegations that market prices are too low. *See, e.g.*, *Blue Shield of Va. v. McCready*, 457 U.S. 465, 481–84 (1982); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789–90 (6th Cir. 2002). Also of little help is the international trade authorities' conclusion that the practices of these three Chinese companies harmed the American solar-panel industry. It should come as no surprise that anti-dumping statutes bar the kinds of injuries caused by dumping. That conclusion, however, says nothing about whether these same injuries are a concern of the antitrust laws. The trade laws have a protectionist focus on "injury to [domestic] industry," which does not always square with the antitrust laws' focus on consumers and "injury to competition." *USX Corp. v. United States*, 682 F. Supp. 60, 65–67 (Ct. Int'l Trade 1988); *see also* 19 U.S.C. § 1673; *Goss Int'l Corp. v.*

*Man Roland Druckmaschinen AG*, 434 F.3d 1081, 1090–91 (8th Cir. 2006). Accordingly, even if a § 1 predatory-pricing claim does not require recoupment, Energy Conversion still had to prove recoupment to show a harm protected by the antitrust laws. With no allegation on that score, its claim fails for this similar but independent reason.

B.

Energy Conversion separately claims that the district court erred when it dismissed the case with prejudice. It should have made the dismissal without prejudice and should have allowed the company to file an amended complaint that included a recoupment allegation.

Under Civil Rule 15, a court must "freely give" parties leave to amend their pleadings before trial "when justice so requires." Fed. R. Civ. P. 15(a)(2). But this permissive standard does not apply when a party seeks to amend its complaint *after* an adverse judgment. "Courts in that setting must consider the competing interest of protecting the finality of judgments and the expeditious termination of litigation." *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615–16 (6th Cir. 2010) (quotation omitted). A party seeking such an amendment thus must satisfy both the "modest requirements of Rule 15" and the "heavier burden" that applies to requests "for reopening a case." *Id.* at 616; *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). Under Civil Rule 59, Energy Conversion could satisfy that burden in several ways, including by showing its proposed amendment "prevent[ed] manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005). Any such challenge is reviewed for abuse of discretion. *Leisure Caviar*, 616 F.3d at 615.

Nothing of the sort happened here. Energy Conversion had ample notice of the issue. Its lawyers were the same ones that pursued parallel litigation in the Northern District of California. In that case, they filed a complaint that initially alleged recoupment. For reasons of their own, they amended the complaint and removed the allegation. *Compare* No. 4:12-cv-05272-SBA, R. 1 at 34–36 (N.D. Cal. Oct. 11, 2012), *with* No. 4:12-cv-05272-SBA, R. 70 at 38–41 (N.D. Cal. Feb. 14, 2013). The Supreme Court, moreover, had noted the relevance of recoupment to low-price claims under § 1, had held it required in low-price claims under § 2, and numerous circuit courts had, before the company filed suit, treated § 1 and § 2 predatory-pricing claims similarly.

*Brooke Grp.*, 509 U.S. at 224; *Matsushita*, 475 U.S. at 592–93; *Wallace*, 467 F.3d at 1106–08; *Rebel Oil*, 51 F.3d at 1432–34, 1444; *Multistate Legal Studies*, 63 F.3d at 1548–49. Even after Suntech, Trina, and Yingli moved to dismiss the complaint largely based on Energy Conversion's failure to plead recoupment, the company did not amend the complaint, even if just to add the allegation in the alternative. It instead argued that it was "not required to plead recoupment." R. 38 at 20. Only after the district court rejected the argument and dismissed the case under Rule 12(b)(6)—a dismissal presumptively with prejudice, *Pratt v. Ventas, Inc.*, 365 F.3d 514, 523 (6th Cir. 2004)—did it seek an amendment.

Plaintiffs may not use Rule 59 motions to "raise arguments which could, and should, have been made before judgment issued" and may not "use the court as a sounding board to discover holes in their arguments, then reopen the case by amending their complaint to take account of the court's decision." *Leisure Caviar*, 616 F.3d at 616 (quotations omitted). The district court was well within its "considerable discretion" in denying Energy Conversion the opportunity to add an allegation it should have raised earlier. *Id.* at 615.

This case offers a poor analogy to *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634 (6th Cir. 2003). *Community Health Systems* concerned a situation where the plaintiff included all of the relevant elements in his complaint but lacked notice of a heightened pleading standard until the moment the district court dismissed the complaint. *Id.* at 645; *see also Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 844 (6th Cir. 2012). That is not remotely this case.

Energy Conversion last of all points to the district court's failure to issue a scheduling order setting a deadline to "amend the pleadings," as required by Civil Rule 16(b). Without such a deadline, says the company, a request to amend the complaint, even after judgment, should face minimal hurdles. Energy Conversion never complained about the lack of a deadline below and so has failed to preserve the argument. *See Scottsdale Ins. Co v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008). Even if it had, this court has been abundantly clear that, once judgment issues, concerns about finality dilute the otherwise permissive amendment policy of the Civil Rules. *Leisure Caviar*, 616 F.3d at 616. The request, the district court reasonably found, came too late and contained too little justification.

For these reasons, we affirm.